Next case for argument is N. Ray Stone Pine Investment Banking. It's dockets 21-1431 and 21-1439. Counsel, we're ready to hear your argument. Thank you, Your Honor, and may it please the Court, my name is David Fine. I represent Appellant Cross Appellee Jack Kackas. Mr. Napoli, sitting at counsel table, represents the remainder of the Appellant's Cross Appellees. He and I have chosen to divide equally our time, if that pleases the Court. Thank you, Your Honor, and I'd like to reserve five minutes for rebuttal and to address the cross-appeal issues. The Bankruptcy Court and the District Court made basic, reversible, legal errors in evaluating the trustee's sole claim against Mr. Kackas, and Mr. Kackas asked the Court to vacate the judgment against him and remanded the Bankruptcy Court with instructions for that Court to enter judgment in Mr. Kackas' favor on all counts of the adversary complaint. By 2005, Mr. Kackas was a former interest holder in Stone Pine Investment Banking, which I'll refer to, as we have in the brief, as SPIB. There is no claim that by 2005, Mr. Kackas had any fiduciary duty at all to SPIB. In that year, Mr. Kackas and a business acquaintance, Herman Seiler, who had never had any affiliation with SPIB, much less any fiduciary duty, developed certain business opportunities that the parties have referred to in their briefs as the fortune opportunities. Just a few weeks before they closed on those fortune opportunities, Mr. Kackas and Mr. Seiler involved Paul Bagley, another appellant here, because of his subject matter expertise. The transactions closed. None of the fortune transactions were conducted in SPIB's name. SPIB never came to own any of the shares or other consideration flowing from those transactions, and the transaction document... But didn't your client sign letters of intent on behalf of SPIB? No. No? No, there were not letters of intent on behalf of SPIB, Your Honor. Memoranda? I'm sorry, Your Honor? Memoranda? No, Your Honor. I'm not cutting slicely on the terminology. There was no, to my knowledge, there was no letter of intent for SPIB. There were letters of intent that referred to other stone-pine entities, including, for example, SLSP Holding, which is the entity that ended up actually doing the deal, which was a one of the companies sort of loosely referred to as stone-pine entities. Maybe I'm mistaken as well, if it is mistaken, but I also understood that fortune did address a draft letter of intent to, quote, the stone-pine investment banking LLC. Your Honor, I'll confirm the record when I take my seat, but that's not my understanding. I certainly stand ready to be corrected if I'm mistaken. Circling back to the facts that I just laid out before the court, those are of course, with this argument, I will not be taking issue with the factual findings made by the bankruptcy judge. We believe a number of them were mistaken, but for purposes of this appeal, we're going to focus on the legal implications of those factual findings because, of course, this court's review there is de novo. What are the precise issues your client is raising? There are two issues that I will raise during the argument, Your Honor. The first one is that the statute of limitations barred the claim for intentional fraudulent transfer against Mr. Takas. The second is that because the fortune opportunities never became Spiff's property, they could not be the subject of a fraudulent transfer action. In Colorado, that sounds in usurpation of corporate opportunities or misappropriation of corporate opportunities, but that cause of action could not apply here, even had the trustee raised that cause of action because, number one, the law requires that the defendant be a fiduciary, and it is undisputed that Mr. Takas was not a fiduciary at any relevant time. And the second reason is that under Colorado law, if all of the members of an LLC consent to an action, it cannot be usurpation of corporate opportunities. And here, all of those interest holders, all of those members who, of course, by that point did not include Mr. Takas, but included others, they all consented, and so there could be no claim for usurpation had it been raised. Let me turn, if I might, in the initial offing to the issue of the statute of limitations. The Uniform Fraudulent Transfer Act, as codified in Colorado, allows fraudulent transfer actions to be brought within four years of the transfer or within one year of when it reasonably could have been discovered. We know that the transfer here occurred in 2005. The action was not brought until after 2010, so it certainly was not brought within four years. Then the question is, was it discoverable? There were two arguments that my friend across the aisle raised before the bankruptcy court. One was that, yes, or I'm sorry, no, it could not have been discovered, and so they get the benefit of the discovery rule that's part of the Uniform Fraudulent Transfer Act. The other is that equitable tolling would excuse it. The bankruptcy judge found both to be the case, agreeing with the trustee on both points. The district judge only considered equitable tolling and did not consider the other point. So let me begin, if I might, Your Honor, subject, of course, to your questions, with what the district court focused on, equitable tolling. And the problem with the finding of equitable tolling here is, number one, the Colorado Supreme Court, and it's Colorado law that applies, has set a very high standard for equitable tolling. In fact, it's never found a case in which equitable tolling was permitted. Just so I'm sure what the landscape is, you say the bankruptcy court and the district courts relied on the extraordinary circumstances prong of equitable tolling, but I don't see that. Isn't it just the wrongful conduct? No, Your Honor. They both relied on both wrongful conduct and extraordinary circumstances, because, for example, they both pointed to the fact that the Texas State Court, in the earlier action in 2009, would not allow ART, American Realty Trust, to amend its petition to include the fraudulent transfer claims that the trustee later brought. So they considered that to be an extraordinary circumstance. The problem is that that's not an extraordinary circumstance. Courts all the time make decisions about docket things, and the critical point here is that the Colorado Supreme Court has said that in any event, you cannot avail yourself of equitable tolling unless you exercise reasonable diligence. And, number one, the Colorado courts have said that the mere pendency of an action does not allow you simply to wait. The courts have said that you have to dual track it. The Dean Witter decision from the Colorado Supreme Court says that. You have to dual track it and file a separate action to protect your rights. And yet, ART and the trustee did not do that, and they've never offered an explanation. They ignore the subject, frankly. They've never offered an explanation for why they could not simply have filed a separate action against Mr. Takas, Mr. Bagley, Mr. Jackson, and the rest. They didn't do it, and so they did not exercise reasonable diligence. The district court was incorrect as a matter of law in determining that equitable tolling applies here. On the other point, the statutory discovery rule, the problem is that at the very least, if there was constructive notice of what has been deemed a fraudulent transfer, then that's when the limitation period, that one year, begins to run. What was the notice here? The notice was in 2005, a press release, and in 2009, in the Texas action, there was a declaration by a member of ART's litigation team, which is, of course, the trustee's litigation team, since the trustee is simply ART, cloaked in the mantle of the trustee, saying that they looked at the Delaware Court docket from a separate bit of litigation and saw that while they thought that the fortune transactions had been consummated by SPIB, they learned that it had not been, that it had been by Mr. Bagley, Mr. Jackson, and Mr. Takas. And in fact, we also know that they sought leave in the Texas court to amend their petition to add the claim for fraudulent transfer. And so they knew at that time, and more than a year passed before the bankruptcy proceeding began. Before we leave the press release, wouldn't a reader, a reasonable reader of the press release, think that SPIB got the stock? Why would that be an unreasonable understanding? Because the press release named the individuals who entered into the transaction, Your Honor. Well, that's one piece of it. I guess maybe it's too broad of a question because we'd have to go through it line by line, but I was left with the impression after reading it that a reasonable reader could think SPIB got the stock. I would respectfully disagree, Your Honor. I think it pretty much calls out the individuals. But the better evidence in any event is the Kinney Declaration that we pointed to, that my opponent has simply ignored because he's got no answer to that. What did the district court do with both of these pieces of notice? It seems that this is reviewed for clear error, right? Reviewing for clear error whether the notice was sufficient. I think that's right, Your Honor, for abuse of discretion. Well, those are different things. Fine, Your Honor. The district court's factual findings were reviewed for clear error. I concede Your Honor's point. What the district court did was it looked solely at the press release. It never mentioned the Kinney Declaration. We had raised it many, many times before the district judge, and he never said a word about it, which is in itself clearly erroneous because he didn't consider evidence that was directly on point that my opponent doesn't argue was not properly, did not properly demonstrate all of the storm warnings, if you will. The last thing that I'd like to mention before I cede the lectern to Mr. Napoli, or of course any questions the court might have is, again, on the issue of the merits of the cause of action, the thrust, the entire thrust of the district judge's analysis, and the bankruptcy judge's analysis was that SPIB should have had the fortune transaction, that they were diverted from SPIB. Obviously, we take issue with that, but the point is that a fraudulent transfer action requires that something actually have been the property of the debtor, and the bankruptcy judge's findings say it never became property, should have, but never did. That's usurpation of corporate opportunities. And Mr. Takas, as I said earlier, could not be liable for that because Mr. Takas wasn't a fiduciary. Mr. Takas was a guy who used to be involved with SPIB, who developed a business opportunity with somebody who was never involved with SPIB, and somehow the bankruptcy judge and the district judge converted that into he had some duty to hand it over to SPIB, but they've never pointed to any concrete legal principle for that point. Are there any questions that the panel has before I take my seat? Yes, I have a question. So your latter point suggests that it's your position that Mr. Takas could be determined not to be liable, but Mr. Bagley could be. No, Your Honor. I'm sorry, please go ahead, Your Honor. No, that was my question. No, the answer is that there are two reasons Mr. Takas cannot be liable, because he wasn't a fiduciary and because all of the members of the LLC consented to the transactions. Mr. Bagley was a fiduciary, but he gets the advantage of the fact that all of the members consented to the transaction, so he cannot be liable either.  If we do not accept the latter, the position is that Mr. Takas is not liable, but Mr. Bagley is. That is one permutation of a result, Your Honor, and with that I'll reserve my time. Good morning, Your Honors. May it please the Court. My name is Michael Napoli, and I represent the remaining appellants, Paul Bagley, HLDEF SP Management, American National Security Management, and Princeton Partners. I want to address, and I don't want to copy what Mr. Fine did, so I really want to address, I think, one of the more substantive areas of the Court Below's failures with respect or errors with respect to the fortune transactions. In our view, the trial court made a fundamental legal error in deciding that the fortune fraudulent transfer claims, it confused a mere expectation with the legal entitlement holding that because SPIB would have, could have, or should have had the opportunity to pursue the fortune opportunities, it therefore fraudulently transferred them to HLSP. Counsel, so there's two issues, right? There's there's whether the fortune opportunities were property and then whether they belong to SPIB, correct? That's correct, Your Honor. Okay, so is the threshold issue of whether the fortune opportunities are property properly preserved in this case? I believe it is, Your Honor. And why is that? In part because, Your Honor, the issue of whether or not the opportunities or the property that was being transferred was never directly raised in the bankruptcy court. In fact, during the trial of the case, the parties seemed to concur that the opportunities themselves were too amorphous to constitute property. So you see things throughout the transcript like, for example, they've talked to Nomura, they've talked to Moneda, they've talked to Tech Fund, and by the way, these are not deals, they're hopes and prayers. And you see that in response to these lines of arguments that the trustee in his closing statement in writing at the end of the case at the bankruptcy court argues, however, it is not the conveyance of these opportunities that is the subject of the trustee's fraudulent conveyance claims. It's the ownership interest in HLSP holdings. So we're put in an unfortunate position, Your Honor, and it seems would fall under, certainly under manifest injustice, that we're being held to have waived a point that was indirectly raised and arguing about whether something constitutes property when it was disclaimed as the object of the fraudulent transfer claim. Certainly, there is discourse during the entire trial that these opportunities, and no one ever calls them deals, they're just opportunities, the trustee describes them as inchoate, were the object. It seems to have been disavowed, at least. And then we have the specter of the bankruptcy court coming back sometime later and saying, oh, no, it's the opportunities, and let me explain why. So we don't believe that we've waived it, if for no other reason than we never really had the opportunity to address it given the statements at the trial court level. I want to concentrate, and I want to take the SPIB didn't own it first, because I think it's really important that we go back to basic premises on fraudulent transfer. The statute makes clear that the debtor must acquire rights in the asset before it can possibly transfer the asset. And courts interpreting Colorado's Uniform Fraudulent Transfer Act, or CUFDA, and other states, you know, from Fraudulent Transfer Acts, have made clear that the property interest must consist of more than a unilateral expectation or abstract need. There must be a legitimate claim of entitlement. And we cited the Bob Nicholas case out of Texas, but it's all off dub. In Nebraska, the Supreme Court held that property depends on legitimate and identifiable claim. As a result, you can't transfer something or dispose of something that you either don't possess or do not yet rightfully possess. And what the bankruptcy court never truly found that SPIB possessed these. What it found is that SPIB could have, should have, and but for something that might have happened, it would have. But when you start to get into woulda, coulda, shoulda analysis, what we're dealing with is something that didn't happen. And in order for this to be a fraudulent transfer claim, the opportunities had to hit SPIB, and they didn't. I do want to address the discussion about the letters of intent. So, just if I could clarify your position, you're, you would like us to think about this in terms of the fact that HLSP transferred the opportunities, right? No, I would like to think of this in the fact that the opportunities never belonged to SPIB, and they ended up in HLSP. Because that's what, where the parties wanted to put them. And there was no breach of duty in doing so. They were not required to go to SPIB. Okay. I do want to address the point about the letters of intent, Your Honor. The bankruptcy court identified the three letters of intent, Nomura, Moneda, and Tech Fund. None of them were to SPIB. They were to HLSP Stonepine Investment Banking, which is a different entity. They are between HLSP Holdings, and they are between HLSP Hamilton Lane Stonepine. There is also, I think, and I think it's what Your Honor was referring to, a letter of intent from Fortune that was addressed to Mr. Takas-Kareth, Stonepine Investment Banking. But that letter of intent was actually for a different entity, Hamilton Lane Stonepine Investment Banking, with the bracket, figure out the legality, or legal entity to come, something like that. So we're comfortable with the record that SPIB was never in these letters of intent. It was never in any of those. I do want, and my time is running short, I do also want to address the not property argument, Your Honor. In order for something to be property, there has to be a legitimate claim of entitlement, and Moneda, Tech Fund, Nomura, these opportunities are just that. They're just opportunities. None of those entities was obligated to do a single thing. None of those entities was obligated to pay anybody anything. If you look at the Bob Nicholas case, which is a Texas case, but it's even from Fraudulent Transfer Act case, it involved six purchase orders that the owner of a business shortly before filing transferred to his new business partner. And the court held there was no fraudulent transfer there because those business orders, those purchase orders, were not property because they didn't obligate anybody to purchase anything. And so you have, they remain inchoate, and inchoate is not my word. It's the word that the trustee has used in his briefing, and we agree. So is this argument, how are we reviewing this question about whether the fortune opportunities are property? It's a factual question, right? No, I think it's a legal question. Either it is, it fits the definition of property, a claim of entitlement, or it doesn't. I mean, if the court... But you just have to determine whether it fits the claim of entitlement. You have to know what it is. Well, but you have to use the right legal determinant, the right legal standard. Bankruptcy code doesn't define property. But state law does. But don't you, doesn't the district court have to make findings, factual findings, under the state law understanding of what the property interest is? And the district court would need to make those. Yeah, I agree. It has to make factual findings, but the factual findings, its property, has to be based on the correct legal standard, which is there is a legal entitlement involved. Okay. And there's no legal entitlement. So is that the allegation of error here, that the district court applied the wrong legal standard? Yes. With respect to, is this property? And the other allegation of error, of course, Your Honor, is that the finding that we had waived it below. Unless anyone has any further questions, Your Honor, I've got eight minutes left. Kind of a housekeeping, because we're going to have to write the opinion. And that is, with these other parties, the, for instance, American National Security Management, $90,000 Judgment, and HLPEF, that you also represent, are you asking for a leaf on behalf of them? I am not, Your Honor. They were parties below, obviously the case is narrowed, as we've moved up here. And the parties that are really at issue in this case are Mr. Bagley and Princeton Partners. All right. And so what the bankruptcy called the identified transactions, same thing? That's correct, Your Honor. Okay. Thank you. Let me just sum up by saying we, for the reasons stated in the brief, and for what I've expressed here today, we would like the court to reverse the Bankruptcy Court and District Court's opinions as set forth in our brief. May I proceed, Your Honor? Please. Mitchell Madden, on behalf of your bankruptcy trustee, David Lewis. So, I want to start with where the panel left off with opposing counsel. And that is the notion of what it was that was the subject of the fraudulent conveyances, and in particular, how that worked through a process of valuable assets being transferred that resulted in millions of dollars worth of stock in the pockets of Tackett's and Bagley, notwithstanding existing or potential judgment creditors. So there were four characters of transfers that were against Mr. Bagley. The fortune transaction, and what was valued at the end of the day by the Bankruptcy Court, was the stock he and Princeton partners received. The second was a PEMG transaction, $180,000. The third was that years-long of identified transactions where he and his wife denuded SPIB by getting their income taxes paid, ARC bought, and that kind of thing. And then finally that ANSM transaction. So there's four categories. What Mr. Tackett's is saying is the only fraudulent transfer that went to him out of those, he didn't get anything out of the identified transactions, nothing out of ASM, and nothing out of PEMG. So he's saying all I got was fortune stock. And the District Court erred in saying that the Bankruptcy Court was correct in that that was a fraudulent transfer to me, as I believe they've identified two basic reasons on the threshold issues. And that is, in order to get the fortune stock, somebody gave up something. They say that the something that was given up now, belatedly, first time in this court, was not an asset, was not property subject to conveyance. And that secondly, that property, whatever it was, if it was property, was not SPIBs. The courts correctly were calling what the document said at the time. What resulted in the issuance of the fortune stock to this HLSP, what we now know was a uncontaminated, single, newly minted at the 11th hour entity, Puerto Rican entity, to take and hold the stock. What was transmitted? You don't listen to what the parties call it. You read what the evidence says. And the evidence was the letter agreement signed with fortune. And do you know what was given up? It was called the equity assets. A specifically defined term. And they said that these private equity assets were the three letter agreements. There's one letter agreement, two LOIs, involving these three entities. Now, Your Honor, you're right. There's some confusion with respect to who those letters of intent and letters were with, because they interchangeably use HLSP Holdings for one, HLSP Stone Pine Banking LLC for another, and a joint venture between Hamilton Lane and the Stone Pine Companies for the main letter. And where Your Honor gets to the point where isn't that SPIB, it's because the bankruptcy court said resoundingly, of course that's SPIB. What does that have to do with Mr. Takas? It is that Mr. Takas, in connection with SPIB, prosecuted these equity assets to fruition on the dime of SPIB. Well, he's long gone from SPIB. No, Your Honor, the evidence at the trial court was he carried a business card for the Stone Pine Companies. He was reimbursed every dollar that he spent in developing these transactions. All the trips, not only his trips, but Mr. Bagley's trips, everything that was reimbursed to generate the equity assets transferred to fortune, was paid for by SPIB. Is that enough, or does he have to have an ownership interest, or some higher connection than who reimbursed whom? Again, not enough. In this instance, the bankruptcy court judge factually found that that was enough to show that these assets, these equity assets, were SPIBs, not Jack Takas individually. Because he wasn't prosecuting them individually. He was doing them on behalf of the Stone Pine Companies, which the bankruptcy court found was SPIB. He was doing it on SPIB's nickel, not his nickel, and he was doing it for return that should have gone into SPIB. Last minute, what we now know, after we did the discovery in the adversary case, not available when the Texas case was tried, is that they put it in this uncontaminated Puerto Rican entity because SPIB was being sued, as an alter ego of Matisse. That's what the evidence says they did, and why they did it. And that the bankruptcy court found that, and Mr. Takas' lawyer gets up here and says, we're not attacking any of the underlying findings of fact of the bankruptcy court, because they know in order to do so, it's got to be a clear error. And when Mr. Bagley comes up at the 11th hour and says, oh, it's not property. It's got to be clear error. There's no clear error in those determinations under that fact pattern. Number two, Mr. Takas gets up and talks about the statute of limitations, and he says to you, the two indicia of why it is that either Art, or the trustee, as that hypothetical perfect predator under 544A1 knew or should have known. I think it goes farther. I think that Bagley, in his briefing to you, says new. They both rely upon two pieces of evidence. They both rely upon, I guess Bagley says at 34 and 36 of his brief. They both rely upon a 2008 lawsuit and a declaration from my legal assistant, Shante Kinney. And what they don't tell you is Bagley didn't rely on that in the district court, and neither of them relied upon those pieces of evidence before Judge Tyson. So the question is why? It's because they're not in evidence. What Bagley's new lawyer did on the appeal. If I could please clarify, so that the declaration. Not in evidence in trial. Okay. 2008 judgment, not in evidence in trial. What Tackett's new lawyer did, and Bagley now has adopted in this court, when they got to the district court, is they borrowed a declaration from the clerk's record. Cited as, put it in their appendix, cited as an appendix, and never say it comes from the clerk's record, not the reporter's record. When Bagley cites it to you here, he cites one appendix, APP 159 to 160. When you go back and look at that, when you do the due diligence, you're going to find that comes from a document that wasn't in the record. It's evidence of a fact that doesn't exist for the purposes of this appeal. Was that pointed out in the trial court? Pointed out in what trial court? They never argued it. They did not argue it at all. No. Not in the trial court. Tackett's did it in the district court. They've done it again here. The judgment they're talking about in 2008, not in the record. Not introduced in the trial court. There is, if you look, and I know that I got a dance with the folks that brought me, but if you look, they rely upon Judge Tyson's ruling that these transfers were known to ART by the time of the trial. She cites nothing for that, but if you go look at the record closely, there's no evidence that ART knew of any of the four transactions. They didn't even call Mr. Lewis. They didn't put on any of this evidence. None. Now, what they do say is ART sought the ability to expand the narrow framework imposed upon the Dallas Court, the Dallas Trial Court on motion practice by Bagley and Tackett's. So pursuant to summary judgments and limiting motions, Bagley and Tackett's, consistent with the fact that they didn't produce the underlying documents, or the evidence in discovery, tried to delay everything and tried to delay the appeal in the underlying Texas court case, all found by Judge Tyson. Consistent with that, they convinced the Dallas Court to limit the time frame that you're going to litigate over, and that included discovery, to 2005. Let's think about why. The reason that I believe the trial court did that is to argument that ART was not a judgment creditor as to SPIB. So why are you letting them, Dallas Trial Judge, look into SPIB transactions and transfers when they don't even have a judgment against SPIB? This is a alter-ego case where ART is now saying SPIB is the alter-ego of Matisse. The only judgment is against Matisse. That's the transfers we're going to live with. ART attempted to convince the court, not once but twice, to grant it leave to expand the time frame and discover with regard to other claims. That was denied. That's not appeal, and folks, that appeal is still sitting there in the Dallas Court of Appeals. That open issue, whether or not the trial court erred in not allowing ART to litigate those extra, those other claims, timely raised, and discover them, in that case, still there. That's why the court said that in this case, she believed that the Colorado Supreme Court would equitably toll 388-110 if you were analyzing it solely in the stepping-shoes of ART. Why? It's not an extraordinary circumstance case in the traditional sense of the word. It is you were attempting to litigate those claims and discover those claims, and you still have a bankruptcy trustee effectively owns those claims. That's with respect to 544B. With respect to 544A1, their argument is that somehow under Colorado state law, the trustee would be worse off than a court-appointed receiver. That for a court-appointed receiver, as this court found in the Wing case, I understand that involves Utah law, but that Utah law was as to extinguishment, except for maybe a the and an A, identical to 388-110. This court, in that case, said it's the creditor, the receivers wasn't a claimant until he became the receiver, and therefore none of those statutes had run. In that counsel, isn't your theory on 544A, what it effectively does is it uses Colorado law substance on the fraudulent conveyance, but rejects Colorado law on the statute of limitations or statute of repose. It just allows the the trustee to file any claim, even if it was decades old, as long as they do it, within two years after the filing of the bankruptcy. Isn't that the consequence of your theory? No, no judge. At the first instance, and two reasons why there's not two, we're looking at the term of 388-110, and it says, it says four years or, and it's that tolling provision we're talking about, of course, one year from when the claimant knew or could reasonably have known. Well, the claimant here is the trustee. What we're saying under 544A is that that trustee as claimant does not exist until the moment the bankruptcy is filed, and then what 544A So that means, that means the trustee had a year from then, under the Colorado Discovery Rule, to search through all the documents and figure this whole thing out, and at that time it was fired on October 29, 2011. Isn't that the consequence of what you're saying? And, and that's where your honor is correct, where the trustee gets to tack on his 546A, two years. That's the only, so in other words, as a threshold issue... So, so, so the consequence is you are completely ignoring the Discovery Rule because of 544A. You're superimposing that and saying, we don't have to live by the Discovery Rule over one year. No, what we're saying is something a little bit different. We're saying that because, as a super creditor under 544A, it newly born, the claim can't be barred, wasn't barred pre-petition, and then what we're saying is, if there's a claim that the trustee can bring that's not barred pre-petition, he gets two years to bring it. So, as a practical matter, I see, Judge, I see where you're going with it. So, so, so that means the trustee is not bound by the Discovery Rule or Colorado Statute, is that what you're saying? So, in a, in effect, in effect, what we're saying is because of the way 38.8.8.1.10 is worded and because the tolling provisions apply to that claimant and that claimant doesn't exist as a vestige of how that language is, that's correct. Just like, just like, the receiver in Wayne. Same statutory language. Same identical statutory language. And this court has done that not once in Wayne, but twice. It's done it in Courtney Hughes Cline. Same result says that, that the statute doesn't exist for a receiver. Wait a minute. Your theory under 544A.1, the only authority you have on that is that effectively you have this receivership case and you have a bankruptcy court decision in Arizona. That's it. That's right. Wayne has a receivership case. Wait a minute. Wait a minute. Okay. That is a very significant consequence of the filing of bankruptcy and giving the trustee two years. It would seem to me that it is so significant that it would be far more authority than a bankruptcy court in Arizona and a receivership case based on Utah law from this court. Is that a wrong perception? A judge, it is a presumption of what it is. So, if it's the first time in federal court jurisprudence at this court's level that this issue can come up, all I can say, and I've been doing this 37 years, is it's the first time it's come up. And there's going to be some pressure about this issue. I verily believe at the conclusion of this proceeding and what my client is saying is the right-minded look is there is zero distinction of any import between a receiver and a receiver bringing that claim and a trustee and a trustee bringing that claim. The second point I want to make about wing and the distinction the opposing counsel makes about wing is they want to argue, no, no, no, it's really an adverse domination case. But they don't realize how that cuts against them in their argument that you don't equitably toll because adverse domination is equitable tolling. And we've said in connection with Yes, Your Honor? Is it Your fallback position is that there is equitable tolling. General, isn't that correct? Well, my first position is that there's no stand in the shoes, 546B that there's no evidence. The evidence they're telling they're supporting that ART knew or could have known. There's no evidence in the record. What they cite to doesn't exist. That's number one. Number two is you need to rely upon generally equitable tolling. Not to get, no. That's just a fundamental. You've got a statute of limitations defense. You've got the burden of proof to show that ART knew more than a year before this bankruptcy was filed. That is before October 29, 2010. Going back a lot of years. You have to show that and what I'm saying is when they come to this court with the evidence of what ART knew and when it knew it, it's not in the record. So they fail to meet their burden of proof. This court under Richeson affirms and we get on down the road. That's what I'm saying, number one. Number two Let me tell you, I'm completely confused now. Because I thought your general position was that 544A allows the district court to pursue pretty much anything within the two year period. The fallback position was that the concept of equitable tolling would allow them to file this after the tolling. Or by the time the tolling has expired. Isn't that true? Okay, so Judge, let me articulate the four points that we have on statute. To make sure that I understand how equitable tolling versus the discovery rule is interfered in this. Okay, so first affirmative defense, they bear the burden. If it's a stand in the shoes analysis under 544B they've got to show what ART knew and when it knew it as to the four levels of transfers. They haven't done it. What they've come to this court and done is argue stuff not in the trial court record of the trial. And they've done so by borrowing it from a clerk's record putting it in an appendix and not telling anybody. It's not from the record. That's number one. So under Richardson, if that's the case, this court's affirmed the trial court's determination that it was timely just for that reason alone. Number two, under 541A 544, I'm sorry 544A. What? The trustee is a perfect creditor. The threshold analysis is the trustee is just like the receivers this court has ruled upon in Wing and in Cornelius Klein and that when it says that this has got to be known to the claimant, it wasn't known to the claimant. The claim did not expire pre-petition and therefore the trustee had its two years. Number two, they argue that number two under that scenario they argue that, well, that's just, that's not looking at the fact that certain courts when they apply 541A in this context recognize that there's the concept of then we get back to the argument of what a creditor a hypothetical purpose creditor would or could have known. Are you talking about equitable tolling now? No, not yet. Not yet. You're talking about timeliness. Right. I'm still talking about that perfect creditor if that trustee's in that position, then the argument becomes assuming that it doesn't just cut off and you get to go back and you get to have a notice argument that they're correct about that. So I'm addressing that second argument. Then you address what evidence there was. And the evidence was the only public knowledge about any of this was not one press release judge but two. And the reason that causes confusion is the first press release said that the deal was going to be done with a company involving Stone Pine and Hamilton Lane. That press release was out. We know from the fact that Hamilton Lane became greatly exercised because that press release was just a lie. But the second press release comes out, names the same company that doesn't tell anybody, no, this is now not Hamilton Lane at all. It doesn't say this is a Puerto Rican company and it doesn't say that in order to do this, SPIB has conveyed its private equity assets. It doesn't say any of that. So their argument is that the trustee, David Lewis, looking back in 2010, was supposed to know, A, that there was this foreign press release from a Swiss company traded on the DAX, translated into English, and that from that press release that there was fraudulent conveyances made, which is the next point, Judge. They want to argue that 38-8-1-10, since it doesn't use fraudulent transfer with respect to every section, A, B, and C, that somehow all you need to know of is the transfer. Hypothetical. I've got a company that I've got judgment against and I get post-judgment discovery and they're big suppliers. They have five big suppliers and I get all the checks and all the invoices. They say the minute you get the checks and the invoices, you got one year to sue over the fact that one of those companies is owned by the spouse and they're fake invoices and none of the supplies were ever issued. We say no. You need to know it's fishy. Judge Tyson said that none of this would find, you could not figure out it's fishy. Then finally, equitable tolling. Assuming that a perfect creditor should have known, even though the judge is already sound, you wouldn't know from the evidence because nothing's fishy. Assuming even though the record doesn't support it, Art New, or like a perfect creditor, should have known. There are two reasons that equitable tolling apply in this case. They're the kissin' cousins of adverse domination. It is the trial court's finding that ART tried and couldn't proceed. The bankruptcy trustee suffered from the debtor's principles concerted planner scheme to delay, conceal, deny, thwart the appeal, and delay the bankruptcy just to try to expire the statute of limitations. That's where equitable tolling would come in. Now, why I was talking about equitable tolling and wing when we got off on this train track is because interestingly enough, when they come and tell you, no, no, don't apply wing as Mr. Madden wants you to and just say it means it doesn't expire pre-petition period, treat it as an adverse domination case, that's this court saying that Utah with an identical statute to 38-810 would recognize adverse domination tolling to that statute. That's equitable tolling. That's exactly what Judge Tyson did here. Does it matter that it's an LLC? Not at all. And we've cited cases in our brief. So I've got two minutes. I want to talk about my cross appeal just for a second if I can. And that is that Judge Tyson, in her grace and wisdom, determined that we had a better remedy and that therefore we didn't need alter ego. They're not mutually exclusive. We tried to tell that to the Dallas Court of Appeals, the Dallas Court, and she said there are two time frames. We're only focused on the latter. She found, as to the latter, only two of the eight factors. She said there's not enough here to show separateness and number two, there's adequate records. In so doing, she directly, that directly conflicts with her other findings that there was hopscotch in the documents, that they were all in it together. If the court just reads the first thing she gets to, it's Bagley's intent and credibility. She finds all the predicate on and after 2005 to affirmatively find there was no separateness. She then finds there's adequate records, yet in that very same preamble, she knows that many of the records that the three guys generated were generated to perpetrate this plan or scheme. So they weren't adequate or proper records. All we're saying on this appeal is this. When she said in consideration of the fact that Bagley wasn't found individually liable in the 2000 trial and the underlying judgment is a contract debt, attorney's fees, I find that there's a better remedy than this equitable remedy. Fraudulent conveyance is an equitable remedy. They argued that we need equity and equitable totaling to get there. So they're both of equal dignity. But more importantly, the analysis was the conduct to be Bagley and Tackett's in this case is not the 2000 judgment. It's the Spiv judgment and that was not a contract judgment. That was a judgment that they manipulated and abused the corporate form. If I have no other questions, I thank your honor. Thank you. I'd like to pick up if I may by answering a few questions that arose from the court, both when I was up earlier and when Mr. Madden came up. First of all, Judge Phillips, you asked about the letter of intent. The letter of intent, which is on page  court, says that it refers to the bankruptcy court to Hamilton Lane slash Stone Pine Investment Banking, HLSP, and then defines it as HLSP. It wasn't talking about Spiv. It was talking about that separate entity, that Puerto Rican entity. So that's not at all the case. The press release, which is at page 15 of the bankruptcy court's findings of fact, simply refers to HLSP Holdings Corp, a member of the Stone Pine family of companies. It does not mention Stone Pine Investment Banking LLC. Mr. Madden talks to you about things like the business card that Mr. Takas had and the email address. And as Judge Phillips pointed out, none of that matters because he didn't have a fiduciary duty. So he can't be liable for appropriation of a business opportunity. He was free to do what he wanted to do with respect to the fortune opportunities. Let me pause you just one moment. We don't seem to have a clock displayed. I wasn't going to complain about that, Your Honor. Sorry about that, Judge. It's back. Okay, thank you. All right, thank you. Mr. Madden says that certain disbursements related to the fortune transactions were paid by Spiv. But as he does in his briefs, he never acknowledges a point that we have made at each level of the courts, which is they were reimbursed. Mr. Bagley and Mr. Jackson reimbursed Spiv. And so if Spiv was never out of pocket, that's simply inaccurate. Speaking of things that are inaccurate, Mr. Madden wants to suggest that the Kinney Declaration was never before the bankruptcy court and never before the district court, that somehow we pulled it out of a Delaware file. That's simply not true. It's in the record at 1 App 159. You'll see the date stamp for the bankruptcy court and you'll see the date stamp from the district court. It was in the record there. And by the way, if it weren't, Mr. Madden, the trustee, has waived any claim about that because this very day is the first time he's ever mentioned it. He's never said anything about, well, it wasn't properly in the record, in any of the three layers of the courts. And of course, you can waive a waiver argument. Judge Murphy, you wrote an opinion in 2010 called Cook against Rockwell International, and it said exactly that. And if there's a waiver, the trustee has done the waiving. Now, the statute of limitations. Was it argued in the bankruptcy court? Was the Kinney Declaration? Yes. Your Honor, honestly, I don't know that it was. And is the point that it wasn't an exhibit, or is the point that it wasn't admitted, or is the point that it wasn't anywhere to be found in files in the If Mr. Madden is telling you it wasn't anywhere to be found in the bankruptcy court files, he's wrong because it's got a date stamp on it. If his point is that it wasn't admitted, then he's waived that argument because he never raised it in the district court, and he never raised it in briefing before this court. On the statute of limitations issue, there's a question that I kept posing in briefs in the district court and before this court, which is, why didn't the trustee, or why didn't Art, just file a separate action when the Texas court wouldn't let it pursue the case? The trustee has never answered that question, and still hasn't answered that question, even yet today. Now, Mr. Madden tells you, well, the Texas appeal is still pending. And I'll be darned if I can figure out why he thinks that that's so, because in my reply brief, I offered a link to the docket of the Texas Court of Appeals showing that that was dismissed in 2010. Mr. Madden hasn't told the court he hasn't taken issue with that, so I don't know where he gets the idea that it's still pending, because this court can take judicial notice of that court, and that court says that it was dismissed. Now, wing against Dockstader, which, of course, was Judge Murphy's case from way back. As Judge Murphy points out, number one, it's a receiver case, and receivers are simply distinguishable from bankruptcy trustees, because receivers represent one entity, the debtor. The bankruptcy trustee represents all of them, and as the trustee has said many times in this case, the trustee steps into the shoes of the creditors, and one of those creditors, in fact, the only outside creditor that Spiv had was Art, and Art knew about what they claimed were the fraudulent transfers. The final point that I'll make is, Judge Murphy, you were pointing out that there was only an interpretation of the wing case and the Arizona bankruptcy court case, and said, well, you would think that if there was something in favor of Mr. Madden's position, there would be more case law, and Mr. Madden said, well, it just hasn't come up. That's not true, because we've cited to the Archdiocese of Milwaukee case, and a number of other cases in our briefs, that all say that there is at least constructive notice that is important in evaluating uniform fraudulent transfer act claims in the bankruptcy courts. They all say that the Arizona court was wrong. So Mr. Madden is simply wrong about that. I'm going to leave the balance of my time to Mr. Napoli, and simply ask this court, please, to vacate the judgment against Mr. Takas, and remand with instructions that the bankruptcy court enter judgment in favor of Mr. Takas on all claims asserted in the complaint in this case. Thank you, Your Honor. Thank you, Your Honor. Thank you, Your Honor. I want to briefly address the alter ego or appears in the corporate fail counterclaim or cross appeal. First of all, the very first time that we have heard that somehow or another their alter ego claim is limited to this second time period is in this proceeding. At the district court level, they argued that it was the whole period, and they repeatedly cited the district court and the bankruptcy court to the quote unquote gymnastic movement of funds in 2003, and the second period started in January 2005. So clearly, they're all relying on more, and I think that's appropriate. I think the bankruptcy court looked at the two time periods as an analytical tool, but she based her decision on all of it, and she led a very detailed review of the evidence and found that none of the three-part test imposed by Colorado law for appears in the corporate fail plight. There was no unity of interest. The court was, of course, well aware of her findings in connection with the fraudulent transfer, and what the court said is, yes, there were fraudulent transfers here, but they don't rise to the level of disregarding the separateness of the entities and the separateness between Mr. Bagley, Mr. Takas, and the others. My time is up. I will close very briefly by asking the court to affirm the ruling with respect to the reverse with respect to the rulings against Mr. Bagley and Prince Partners as set out in our briefing. I thank you very much, Your Honors. Thank you all for your arguments. The case is submitted. Counselor excused.